IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 4, 2003 Session

## STATE OF TENNESSEE v. MAURICE PRUITT

### Appeal from the Circuit Court for Gibson County
No. H-6859    Donald H. Allen, Judge

### No. W2002-01905-CCA-R3-CD - Filed July 8, 2003

The defendant, Maurice Pruitt, appeals from his conviction by a jury in the Gibson County Circuit Court for the sale of one-half gram or more of cocaine, a Class B felony. The trial court sentenced him as a Range II, multiple offender to eighteen years in the Department of Correction to be served consecutively to a ten-year sentence from another county. The defendant contends that (1) the pretrial identification procedures were suggestive and violated due process and (2) the trial judge erred by entering the jury room. We affirm the judgment of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

Harold R. Guinn, Humboldt, Tennessee, for the appellant, Maurice Pruitt.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; Garry G. Brown, District Attorney General; and Edward L. Hardister, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This case arises from an undercover drug operation on June 27, 2000, in which Charlotte Lumpkin purchased crack cocaine from the defendant. Sergeant Jacque Bass of the Paris Police Department testified that in the summer of 2000, he worked as an undercover agent making street-level cocaine purchases for the Drug Task Force. He was partnered with Charlotte Lumpkin for each purchase he made. His 1991 Ford Explorer had audio and video recording equipment, and Ms. Lumpkin wore a wire to record any conversations that could not be picked up by the equipment in the car. On the day of the sale, he and Ms. Lumpkin received $100 or $200 to buy drugs and began driving around Humboldt to make a purchase. He said he talked with Thomas Boykin who told him that he would take them to buy crack cocaine. He said Mr. Boykin got into the car and directed him to drive to a specific house. Sergeant Bass gave Ms. Lumpkin $100, and she and Mr. Boykin walked

up to the house.  Sergeant Bass said that he remained in the car and that a bush blocked his view once Ms. Lumpkin and Mr. Boykin stepped onto the porch.  He said he saw the top of the screen door open.  He said Ms. Lumpkin and Mr. Boykin returned a couple of minutes later and got in the car.  He asked Ms. Lumpkin if everything went okay, and she said yes.  He said he gave five dollars to Mr. Boykin and took him to another street.  Ms. Lumpkin then gave him the crack cocaine, which she had been holding in her hand.  Two or three minutes later, Sergeant Bass gave the crack cocaine to Agent Danny Lewis at the Drug Task Force office.

Sergeant Bass testified that after Mr. Boykin got out, Ms. Lumpkin said the person who sold the drugs to her was a man whom they previously had seen in a light blue car.  He said that on another occasion, Ms. Lumpkin had spoken to a man in a blue car who would not sell drugs to them.  He said the car was distinctive, older but in extremely good condition, and trimmed in gold.  Sergeant Bass said the blue car was not present at the June 27 buy.  He said that Ms. Lumpkin could not remember the man's name but that after they returned to the office, she identified the defendant as the seller from a photograph array.  On cross-examination, Sergeant Bass testified that they did not target the defendant after the failed attempt to purchase drugs.  He said he was filling out a report while Agent Lewis laid the photograph array on a desk about twelve feet away.  He said Agent Lewis may have handed the photographs to Ms. Lumpkin, who then laid them out.  He also said he did not see Agent Lewis point to anything or prompt Ms. Lumpkin when she identified the seller's photograph.

Charlotte Lumpkin testified that she lived in Humboldt, Tennessee, from 1999 to 2001.  She initially declined an offer to buy drugs undercover for the Drug Task Force but later approached Agent Lewis and accepted the job.  She was paid regardless of whether someone was arrested or charged.  Sergeant Bass was her partner for each attempted buy, and she wore a recording device when they went out to purchase drugs.  She said that during the afternoon of June 27, 2000, Thomas Boykin stopped their car.  Sergeant Bass talked to Mr. Boykin, who got into the car and directed them to Brian Pearson's house.  She said that she had purchased drugs from Mr. Pearson before but that she did not deal with him that day.  She said that Sergeant Bass gave her $100 and that she walked up to the house with Mr. Boykin.  She said that the defendant came to the door and that she told him she wanted to buy "a bill," which was one hundred dollars worth of crack cocaine.  She said the defendant pulled out a bag from his pocket, said "hold on," and went inside for a moment.  She said that when he returned, he gave her five rocks of crack cocaine.  She said she and Mr. Boykin returned to the car.  She said they drove around the block, Sergeant Bass gave Mr. Boykin five dollars, and Mr. Boykin got out of the car.  She said she handed the drugs to Sergeant Bass.

Ms. Lumpkin testified that at the time, she did not know the defendant but had seen him around Humboldt.  She said she knew he drove a sky blue car with gold trim and rims and a navy blue top.  She said this car was very well known in Humboldt.  She said that after they returned to the Drug Task Force office, she told Agent Lewis that she did not know the seller's name but that she knew what he drove.  She said Agent Lewis got six Polaroid pictures out of his desk, placed them on the desk in rows of three, and asked her if she could identify any of them as the seller.  She said she immediately recognized the defendant as the person who sold her drugs.  She said Brian

Pearson's photograph was one of the pictures Agent Lewis showed her and the house they went to was Brian Pearson's. On cross-examination, Ms. Lumpkin said that on an earlier occasion, she had stopped the defendant in his sky blue car and attempted to buy drugs but that the defendant had declined because she was riding with the police. She admitted that she recognized three of the people in the photograph array including the defendant. She also said Agent Lewis did not discuss the photographs with her before taking them out. She admitted that she had been convicted of domestic assault and forgeries.

Lieutenant Danny Lewis of the Humboldt Police Department testified that he worked with the Drug Task Force and was the control agent for Charlotte Lumpkin and Sergeant Jacque Bass. The officers searched Ms. Lumpkin and placed an audio recording device on her. After they received money for the purchase, Sergeant Bass and Ms. Lumpkin left to find someone from whom they could buy drugs. Agent Lewis monitored them from a nearby location through audio equipment in their car. He said that when Ms. Lumpkin returned to the Drug Task Force office, he placed six photographs on the desk in two rows of three. He said Ms. Lumpkin immediately identified the defendant as the seller. He said he chose pictures of people associated with the defendant for the photograph array because they could have possibly driven the car Ms. Lumpkin described.

Agent Lewis testified that after Sergeant Bass returned from the transaction, Sergeant Bass gave him the drugs he had received from Ms. Lumpkin. Agent Lewis took the drugs to the Tennessee Bureau of Investigation Crime Laboratory. The laboratory returned the evidence and prepared a report, which stated that the drug was a cocaine base, a Schedule II controlled substance. On cross-examination, he said he did not remember Ms. Lumpkin telling him before this transaction that she previously tried to buy drugs from the defendant. He said that she told him about the previous attempted transaction after completing the June 27 sale and that no report was made on the previous attempted purchase.

Thomas Boykin testified that he pled guilty to facilitation of the sale of cocaine with respect to the drug transaction on June 27, 2000. He said Ms. Lumpkin and Sergeant Bass drove up and asked him where they could purchase drugs. He told them he did not sell drugs but got into the car to take them to someone who did. He said that he directed them to Brian Pearson's house and that he and Ms. Lumpkin got out of the car and walked up to the house. He said the defendant answered the door. He said Ms. Lumpkin remained on the porch while he went into the house and bought drugs from Brian Pearson. He said that he did not know if Ms. Lumpkin bought any drugs but that when he came out of the house, he had to flag Ms. Lumpkin and Sergeant Bass down because they had already left. He said that Sergeant Bass gave him five dollars and that he got out of the car. On cross-examination, he admitted that he was under the influence of drugs that day and not completely aware of what was happening.

Based upon this testimony, the jury convicted the defendant of the sale of one-half gram or more of crack cocaine.

# I. IDENTIFICATION PROCEDURES

The defendant contends that the trial court erred by admitting Ms. Lumpkin's identification of him from a photograph array. He argues that the array was unduly suggestive, making Ms. Lumpkin's identification unreliable. He claims that one of the pictures had Brian Pearson's name on it and that Agent Lewis chose people Ms. Lumpkin knew for the photograph array and arranged the photographs in such a way that she would identify the defendant as the seller. The state contends that the defendant failed to raise this issue prior to trial and has waived the right to challenge it on appeal. Also, the state contends that the photograph array was not unduly suggestive. We agree with the state.

The record reflects that the defendant did not make a pretrial motion to suppress the identification evidence. Rule 12(b)(3) of the Tennessee Rules of Criminal Procedure states that a motion to suppress evidence must be raised pretrial. Failure to move pretrial to suppress an out-of-court identification waives the issue. State v. Burtis, 664 S.W.2d 305, 310 (Tenn. Crim. App. 1983); State v. McCray, 614 S.W.2d 90, 94 (Tenn. Crim. App. 1981); see Tenn. R. Crim. P. 12(f).

Furthermore, the defendant made no objection to the identification procedures at trial. When the trial court admitted the photographs used in the array into evidence the defendant made no objection. At the time they were admitted, one of the photographs had Brian Pearson's name at the bottom. After Ms. Lumpkin testified that Brian Pearson's name was not on the photograph when she identified him as the seller at the Drug Task Force office, the defendant objected, arguing that the photograph was not an original. The trial court ordered Mr. Pearson's name to be covered before the photograph was passed to the jury. In his motion for a new trial and in his appellate brief, the defendant now alleges that the out-of-court identification was so suggestive that it deprived him of due process. His objection at trial challenged the authenticity of the photographs admitted into evidence. The defendant may not object on one ground and then assert a new or different theory to support the objection in the motion for new trial or on appeal. State v. Adkisson, 899 S.W.2d 626, 634-35 (Tenn. Crim. App. 1994).

# II. THE TRIAL JUDGE ENTERING THE JURY ROOM

The defendant also contends that the trial judge entered the jury room at some point. His sole support for this contention is a reference to the transcript of his motion for a new trial, which he did not include in the record on appeal. He provides no reference to the record he submitted. It is the duty of the appellant to prepare a record that conveys a fair, accurate, and complete account of what transpired in the trial court with respect to the issues that form the basis of the appeal. T.R.A.P. 24(b); State v. Miller, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987). Generally, when the record fails to include relevant proceedings or documents, we must presume the trial court's ruling on the issue to be correct. State v. Bennett, 798 S.W.2d 783, 789-90 (Tenn. Crim. App. 1990).

Based on the foregoing and the record as a whole, we affirm the judgment of conviction.

_____

JOSEPH M. TIPTON, JUDGE